AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
MAY 06 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Apple Cellular Telephone  Model: iPhone 8
IMEI: 356774086578325

Case No. **19MJ1834**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, incorporated by reference.

located in the   Southern   District of   California  , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 and 963 | Importation of controlled substances and conspiracy to do the same |

The application is based on these facts:
See Affidavit of HSI Special Agent Pearlene Hill, incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Pearlene Hill
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/6/19

*Judge's signature*

City and state: San Diego, California

HON. JILL L. BURKHARDT
*Printed name and title*

# ATTACHMENT A

PROPERTY/ITEMS TO BE SEARCHED

The property/items to be searched are described as:

> Apple Cellular Telephone
> Model: iPhone 8
> IMEI: 356774086578325
> Contained in Evidence Bag
> FP&F Case No. 2019250600044401

Currently in the possession of the U.S. Customs and Border Protection located at 9495 Customhouse Plaza, San Diego, California 92154.

## **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search **Target Device** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of **Target Device** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from **Target Device** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of November 15, 2018 up to and including February 1, 2019:

a. tending to indicate efforts to import methamphetamine, heroin, cocaine, and fentanyl or other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, heroin, cocaine, and fentanyl, or other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, heroin, cocaine, and fentanyl, or other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, heroin, cocaine, and fentanyl, or other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, §§ 952, 960, and 963.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>Apple Cellular Telephone<br>Model: iPhone 8<br>IMEI: 356774086578325<br>Contained in Evidence Bag<br>FP&F Case No. 2019250600044401 | **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT** |

I, Pearlene Hill, a Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), having been duly sworn, depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic device, as further described in Attachment A (hereinafter the **Target Device**):

    a. Apple Cellular Telephone
        Model: iPhone 8
        IMEI: 356774086578325
        Contained in Evidence Bag
        FP&F Case No. 2019250600044401

and seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 952, 960 and 963, as further described in Attachment B. This search supports an investigation and prosecution of Isaac Jordan Teodulo PINNICK ("PINNICK") for one or more of the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Device** was seized on February 1, 2019 from PINNICK by United States Customs and Border Protection (CBP) officers after he was arrested for driving a 2003 Honda Accord into the United States through the Otay Mesa Port of Entry (POE) in

1

San Diego, California with approximately 27.22 kilograms of methamphetamine, 1.20 kilograms of heroin, 3.58 kilograms of fentanyl, and 2.30 kilograms of cocaine concealed within the dashboard, seats, firewall, heater core area, and gas tank. Since its seizure, the **Target Device** has been in CBP's possession and was securely stored at 9495 Customhouse Plaza, San Diego, California 92154 on February 15, 2019[1].

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training and consultation with other federal, state, and local law enforcement agents and officers who are experienced in the area of narcotics smuggling. The evidence and information contained herein was developed from my personal knowledge or have had them related to me by persons mentioned in this affidavit. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation. Instead, it only contains those facts believed to be necessary to establish probable cause.

//

---

[1] Although according to a report written by him, CBPO Garay (the seizing officer on the night of PINNICK'S arrest) denies seizing a cellular telephone from PINNICK, a telephone was annotated on the inventory sheet as part of PINNICK's personal property seized from him during his February 1, 2019 arrest. When I arrived to the POE, I removed the **Target Phone** from a bin containing all of PINNICK'S personal property and attempted to download it. I was unable to obtain anything from the phone. I also allowed PINNICK to access the Target Phone during his post-arrest interview in order to obtain telephone numbers contained therein. He was able to do so. I then returned the **Target Phone** to the personal property bin. PINNICK's personal property was seized as line item 0008 to FP&F seizure number 201925060004401. On February 15, 2019, I returned to the POE to determine whether the **Target Phone** was still there. I found it still secured as line item 0008 to FP&F seizure number 201925060004401 along with PINNICK's other personal effects: a wallet, belt, driver's license, and hat. On that same date, I removed the **Target Phone** and seized it separately as line item number 0009 to FP&F seizure number 201925060004401 and secured it in CBP's evidence vault. It remains there.

2

## EXPERIENCE AND TRAINING

5. I am a Special Agent with HSI, which is a component agency of the DHS. I have been employed as an HSI Special Agent since May 2018. I am currently assigned to the HSI DSAC San Ysidro field office in San Diego, California. My job duties are to investigate the smuggling of controlled substances into the U.S. I have been cross-designated by the U.S. Drug Enforcement Administration (DEA) to conduct narcotics investigations and enforce provisions of the Federal Controlled Substances Act, pursuant to Title 21 of the United States Code. Prior to employment with HSI, I was employed as a Special Agent with the U.S. Secret Service (USSS), from August 2017 until May 2018; as a Uniformed Division Officer with the U.S. Secret Service (USSS), from September 2014 until August 2017; and as a Police Officer employed by the Chapel Hill Police Department (CHPD), from September 2008 until September 2014.

6. Prior to becoming an HSI Special Agent, I graduated with honors with a Master of Science degree in Criminal Justice specializing in Homeland Security from Saint Joseph's University. I received a Bachelor of Arts Degree in Psychology from the University of North Carolina at Chapel Hill and I served in the Army National Guard as a brigade senior movement non-commissioned officer.

7. As an HSI Special Agent, my formal training consisted of six months of residential instruction at the Federal Law Enforcement Training Center in Glynco, Georgia, which included training related to narcotics and dangerous drugs. I also learned fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence, preservation of a crime scene, and the use of electronic evidence. I have participated in training programs related to controlled substances, including but not limited to marijuana, cocaine, methamphetamine, and heroin. I have also received training in the methods used by narcotics traffickers to import, distribute, package and conceal controlled substances. I have participated in several narcotics investigations and executed arrests for drug-related offenses, including possession with the intent to distribute, transportation, and the importation of controlled substances. Additionally, through the

course of my duties as a Special Agent, I have discussed narcotics smuggling and trafficking with other experienced narcotics investigators and received informal training regarding illegal drug trends and methods of operation for multi-kilogram drug smuggling, trafficking, and dealing in the San Diego area.

8. Based on my training and experience, I am familiar with the ways in which drug smugglers and traffickers conduct their business. During the course of my duties I have (1) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs crossing the border from Mexico into the United States, and while operating inside the United States; (2) participated in the execution of search warrants on cellular phones related to drug investigations; (3) executed or participated in numerous arrests for drug-related offenses, including possession with the intent to distribute; and (4) interviewed criminal defendants, witnesses, and informants in furtherance of investigations into the illegal smuggling and trafficking of controlled substances. Through these duties, I have gained a working knowledge and insight into the operational habits of drug smugglers and traffickers and the structure of their narcotics smuggling networks.

9. Based upon my training and experience and consultations with law enforcement officers experienced in drug smuggling and trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug smugglers and traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages;

   b. Drug smugglers and traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

   c. Drug smugglers and traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

d. Drug smugglers and traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e. Drug smugglers and traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

f. Drug smugglers and traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

10. Based upon my training and experience as a Special Agent, and consultation with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, through my training, education, that searches of cellular/mobile telephones associated with narcotics smuggling yield evidence:

a. Tending to indicate efforts to import methamphetamine, heroin, fentanyl, cocaine, or other federally controlled substances from Mexico into the United States;

b. Tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, heroin, fentanyl, cocaine, or other federally controlled substances from Mexico into the United States;

c. Tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, heroin, fentanyl, cocaine, or other federally controlled substances from Mexico into the United States;

d. Tending to identify travel to or presence at locations involved in the importation methamphetamine, heroin, fentanyl, cocaine, or other federally

5

    controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

  e. Tending to identify the user of, or persons with control over or access to, the subject cellular/mobile telephone; and

  f. Tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

  11. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone. In addition, recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of the **Target Device** which may identify other persons involved in narcotics trafficking activities. Accordingly, I believe that information relevant to the narcotics smuggling activities of PINNICK, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, and other digital information are also stored in the memory of the **Target Device**.

  12. Based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of

6

drugs that are being transported. Given those facts, I respectfully request permission to search the Target Telephone for data beginning on November 15, 2018, up to and including February 1, 2019.

## FACTS SUPPORTING PROBABLE CAUSE

13. According to a report prepared by CBP Officer Ibarra, on February 1, 2019, at approximately 4:46 p.m., PINNICK, a United States citizen, made an application for admission into the United States from Mexico through the Otay Mesa Port of Entry (POE). PINNICK presented himself as the driver, owner, and sole occupant of a gold 2003 Honda Accord bearing California license plate 5DEH079 (the "Vehicle"). CBP Officer Ibarra asked PINNICK where he was going and PINNICK stated that he was going to work at the San Diego Naval Yard at which time he showed his Naval Yard work identification card. PINNICK gave CBP Officer Ibarra two negative customs declarations. During CBP Officer Ibarra's inspection, CBP Officer Ibarra discovered a package inside the driver side dashboard. Therefore, CBP Officer Ibarra requested a canine handler to respond to the vehicle. Canine Enforcement Officer (CEO) Stone with his Narcotics and Human Detection Dog (NHDD) "Juno" responded to the vehicle and did a sweep. "Juno" alerted to the rear passenger side door.

14. The Vehicle was then screened using the Z-Portal, and the operator, CBP Officer Rommel, noticed anomalies in the seats and dash area of the Vehicle.

15. According to a report prepared by CBP Officer Garay, he was assigned the secondary inspection of the Vehicle at approximately 5:00 p.m. CBP Officer Garay was aware of a possible narcotics seizure. Thirty-one packages were extracted from the Vehicle's seats and ten packages from the dashboard. Thirty-five packages contained a clear crystal-like substance inside of vacuum sealed bags which field-tested positive for the characteristics of methamphetamine. The total weight of the thirty-five packages were approximately 17.96 kilograms (39.59 pounds). Three packages contained a white hard powder which field-tested positive for the characteristics of fentanyl, weighing approximately 3.58 kilograms (7.89 pounds). Two packages contained a white powdery

substance which field-tested positive for the characteristics of cocaine, weighing approximately 2.3 kilograms (5.07 pounds). The last package tested contained a white hard substance which field-tested positive for heroin and weighed approximately 1.20 kilograms (2.65 pounds). PINNICK was placed under arrest at approximately 6:20 p.m.

16. At approximately 9:33 p.m., CBP Officer Maysonet and I identified ourselves to PINNICK and obtained biographical data. PINNICK was advised of his Constitutional rights per Miranda. PINNICK stated he understood his rights and freely waved them and subsequently signed the Miranda waiver form. CBP Officer Maysonet and I then conducted a recorded interview of PINNICK. During the post-Miranda interview, PINNICK denied knowledge of controlled substances in the Vehicle and claimed he has never transported drugs.

17. PINNICK was transported to the San Diego Metropolitan Correctional Center (MCC) for federal custody and judicial proceedings.

18. According to a report prepared by CBP CEO Leung, on February 2, 2019, at approximately 5:30 p.m., CBP CEO Leung and his NHDD "Zax" received an alert near the heater core area of the Vehicle. Around 7:30 p.m., CBP Officer Dominguez-Albuja conducted an inspection of PINNICK's vehicle and discovered nineteen additional packages within the firewall and heater core area. The packages were wrapped in black tape and contained a white substance which field-tested positive for the characteristics of methamphetamine weighing approximately 9.26 kilograms (20.41 pounds).

19. According to his report, on February 3, 2019 at approximately 8:35 p.m., CBP CEO Labak and his NHDD "Bak" received an alert to a trained odor at the rear ascending unit located in the Vehicle. CBP CEO Labak removed the cap and discovered packages within. CBP Officer Cisneros conducted an inspection of the Vehicle and discovered and removed thirty-two additional packages from inside the gas tank. The packages were field-tested and came back positive for the characteristics of methamphetamine weighing approximately 16.54 kilograms (36.46 pounds).

20. I have reviewed the crossing history for the vehicle PINNICK was driving when he was arrested in the TECS System and determined that the vehicle began crossing regularly into the United States (at least weekly and often multiple times each week) beginning on November 15, 2018.

21. Based upon my experience and investigation in this case, I believe that PINNICK, as well as other persons currently unknown, were involved in an ongoing conspiracy to import methamphetamine, heroin, cocaine, and fentanyl into the United States from Mexico. Based on my experience investigating drug smugglers and traffickers, there is probable cause to believe that PINNICK used the **Target Device** to coordinate with coconspirators regarding the importation, transportation, and distribution of methamphetamine, heroin, cocaine, and fentanyl, and to otherwise further this conspiracy both inside and outside of the United States. Based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of PINNICK, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**. Therefore, for the reasons set forth above, I request permission to search the **Target Device** for items listed in Attachment B for the time period from November 15, 2018 up to and including February 1, 2019.

## **METHODOLOGY**

22. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers

now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the telephones and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

25. Based upon my experience, training, and consultation with other law enforcement officers experienced in narcotics smuggling investigations, and all the facts and circumstances described above, I submit that there is probable cause to conclude that Isaac Jordan Teodulo PINNICK used the **Target Device** to facilitate the offense of importing methamphetamine, heroin, cocaine, and fentanyl. The **Target Device** was likely

used to facilitate the offense by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 952, 960 and 963.

26. Because the **Target Device** was promptly seized during the investigation of PINNICK's trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by PINNICK continues to exist on the **Target Device**. Based on the above facts and my training and experience, there is probable cause to believe that evidence of violations of Title 21, United States Code, Sections 952, 960, and 963 will be found.

27. Therefore, I request that the Court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A and to seize the items listed in Attachment B, using the methodology described above, for the time period from November 15, 2018 up to and including February 1, 2019.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Pearlene Hill
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this __6th__ day of May, 2019.

_____
The Honorable Jill L. Burkhardt
United States Magistrate Judge